## 30590. HAMILTON *v.* METROPOLITAN LIFE INSURANCE COMPANY.

DECIDED DECEMBER 4, 1944.

*J. F. Kemp, J. D. Tindall, Orrin Roberts, Clint W. Hager,* for plaintiff.

*Smith, Smith & Bloodworth, J. C. Knox, Morris Kelley,* for defendant.

MacINTYRE, J. ■ This is an action on a life-insurance policy which contained the following provision: "Suicide: If the insured, within two years from the date of issue hereof, dies by his own hand or act, whether sane or insane, the liability of the company hereunder shall be limited to an amount equal to the premiums which have been received, without interest." It might be noted that no question of double indemnity for accidental death is involved. The defendant, Metropolitan Life Insurance Com-

pany, denied liability to the beneficiary on the ground that the beneficiary's husband, Hugh G. Hamilton, committed suicide within two years from the date of the issue of the said policy. There was no question as to the payment of premiums so as to keep said policy in force and effect, but the defense of the company was based solely on the fact that on account of the above-stated condition in the policy, there could be no recovery thereunder except as to the premiums paid, and it was admitted by the plaintiff that a tender of said premiums paid, in the amount of $65, had been made to her by the defendant prior to the bringing of the suit. After evidence had been offered by the plaintiff and the defendant, as disclosed by the brief of evidence filed in this case, the defendant's motion for a directed verdict limiting the liability of said company to the sum of $65, was granted. The plaintiff moved for a new trial; her motion was overruled, and she excepted.

The evidence was to the following effect: The insured was registered as a guest at the Bankhead Hotel in Birmingham, Alabama, on Saturday night, September 6, 1941. On that night between 12 and 1 o'clock Roy W. Cole, the room clerk at the hotel, received a long-distance telephone call from Mrs. Hamilton (the plaintiff), who was in Atlanta, Georgia, asking if something was the matter with her husband. She stated in that telephone conversation that her husband had just called her, and she wanted somebody sent up to his room to see about him. The room clerk sent a bellboy to the room, who immediately called for the clerk to come up to the room himself. When the clerk entered the room, he found Mr. Hamilton lying on the floor in a part of his underclothes, and there was blood on the floor. He called the hotel telephone operator and told her to get the "law" and to call for an ambulance. He then washed Mr. Hamilton's face. Mr. Hamilton wanted water, and he got some water for him, "but he did not seem to be able to take the water very well." The clerk saw the policeman find a razor blade in the room. The bellboy, who was the first to enter the room, found Mr. Hamilton lying on the floor and a circle of blood on the rug where his arms had been bleeding. He noticed a cut on his wrist, but did not notice whether or not both wrists were cut. However, other positive evidence showed that both wrists as well as Mr. Hamilton's arm had been cut by a sharp instrument. Police officers H. S. Newman and

A. E. Joy answered the police call sent out by the hotel, and went to Mr. Hamilton's room. Officer Newman testified that he found Mr. Hamilton on the floor; that he had been bleeding and that both wrists and the left elbow were slashed as if with a razor blade. There was a razor blade lying on the telephone stand, or the dresser right by it. The officer stated that he asked Mr. Hamilton if he wasn't afraid he was going to die, and Mr. Hamilton answered that he wasn't, that he had tried before and didn't die. Officer A. E. Joy, who went to the room with Officer Newman, stated that they found Mr. Hamilton lying on the floor with both wrists and one arm cut; that the floor was bloody; that Mr. Hamilton's body was half naked and bloody; that the cuts were anywhere from one to two inches long; that they found a Gem razor blade on the telephone stand just up over the body; and that the razor blade was bloody. J. L. Purdy, one of the ambulance attendants who carried Mr. Hamilton to the hospital, stated that when they arrived at the hotel room they found him lying on the floor with cuts or lacerations on both wrists or arms; that he was bleeding and the only clothing he wore was an undershirt, and that there was a considerable amount of blood on the carpet, which he estimated to be approximately a half gallon. Officer Norrell, a detective from the police department of Birmingham, who was on duty at the hospital at the time Mr. Hamilton arrived, testified that he was drinking or drunk, and unruly and rowdy. He further stated that both wrists and the left arm had been cut by a sharp instrument; that he noticed some other scars on his wrists, apparently from cuts across each wrist made with a knife, or razor, or other sharp instrument; that it was very difficult to handle Mr. Hamilton; that he tried to get off the operating table, and it took several to handle him; that he assisted in strapping him on the operating table. Officer Darnell was also on duty at the hospital with the witness Norrell. He stated that Mr. Hamilton was intoxicated and boisterous; that he talked with him, and he said something about his wife—a call to his wife; that the witness inferred that he had had some trouble with his wife, and that he had made a long-distance call from the hotel to his wife; that he checked with the hotel and ascertained that Mr. Hamilton had made a call to Atlanta. Dr. Bonney, who was on duty when Mr. Hamilton arrived at the hospital, testified in behalf of the plain-

tiff, that Mr. Hamilton came into the hospital with wounds on both wrists, on his forearm, and on his left arm, and that the wounds were bleeding; that his condition evidenced that blood had been lost; that he was not co-operative; that his death was caused by peripheral vascular collapse due to hemorrhage; that that meant a cessation of the function of the circulatory system due to the loss of blood; that he attempted to inject fluids into his veins but could not do it, because he would not quiet down. The certificate of death gave suicide as the probable cause of death, as did the proof of death also. Furthermore, there was no evidence to show that any one was in the room with Mr. Hamilton at the time his wrists and arm were cut. The evidence further showed that prior to the time he went to the room he was under the influence of liquor.

At the beginning of the trial there was a legal presumption against death by suicide, and the insurance company had the burden of rebutting this presumption by evidence. "The fact of suicide must be established by a preponderance of the evidence, but the presumption against it is not conclusive and will vanish upon proof of physical facts clearly inconsistent therewith." *Gem City Life Ins. Co.* v. *Striplin,* 176 *Ga.* 288, 290 (168 S. E. 20). If credible evidence of self-destruction or suicide is offered, whether in the course of the plaintiff's or the defendant's proof, the presumption against suicide as a rule of law disappears from the case; this leaves the issue of suicide open, and the trier of facts passes upon the issue in the usual way. Thus the defendant in the instant case must establish the fact of suicide by a preponderance of evidence, which is the usual rule applicable to deciding issues in civil cases. *Jefferson Standard Life Ins. Co.* v. *Clemmer,* 79 Fed. 2d, 724 (103 A. L. R. 171); *United States* v. *Pulver,* 54 Fed. 2d, 261.

There was no evidence from which the jury could have found that the insured was killed by some other person. Then did he accidently inflict upon himself the wounds which caused his death? That he talked to his wife on the telephone, and she immediately called the hotel where he was stopping and asked that someone be sent to her husband's room to see about him; that the hotel authorities complied with her request, and found him alone in his room, lying on the floor, clad only in an undershirt, his body bloody, a large puddle of blood on the floor, a bloody razor blade

on a telephone stand or table near him, and cuts from one to two inches long, made by a knife or some sharp instrument, on the inside of each wrist, on the left forearm, and at the elbow; that he also had old scars across each wrist, apparently from cuts made by a "knife, razor, or some instrument;" that, although he called his wife over long-distance telephone and told her that he was cut, there was no evidence that he sought assistance from the hotel office or otherwise; that when he was discovered in this condition he would not co-operate with the doctors or others who sought to aid him and save his life, plus the proper introduction in evidence by the defendant of a certified copy of the death certificate, made out by the only physician who saw him soon after he arrived at the hospital, and who attended him—all made out a prima facie case that the cause of his death was the cause given in the death certificate, to wit, suicide. Code, § 88-1212; *Metropolitan Cas. Ins. Co. v. Reese*, 67 *Ga. App.* 628, 630 (21 S. E. 2d, 455). And the other circumstances detailed in the testimony above, we think, show that it is not a reasonable deduction from the evidence that the insured accidently cut himself, and in that manner caused the wounds from which he died. The whole evidence adduced is such as to leave room for no other reasonable inference than that he committed suicide by inflicting fatal wounds upon himself and the judge did not err in directing a verdict for the defendant.

■ Ordinary hearsay testimony is without probative value and this is true whether admitted with or without objection. *Eastlick v. Southern Railway Co.*, 116 *Ga.* 48 (42 S. E. 499). Exclusive of the alleged hearsay evidence excepted to in special ground 1, the legal evidence demanded a verdict for the defendant, and the direction of such a verdict was not reversible error.

■ The court admitted in evidence a certified copy of the death certificate made by the Alabama Bureau of Vital Statistics. A note of the trial judge states: "At the time of the taking of the depositions of the various witnesses in Birmingham, Alabama, it was agreed between counsel for the parties that 'any and all formalities are waived and nothing is required of the commissioner but that he reduce the evidence to type, or have it done, and send it direct to the clerk of the court of Walton superior court.' When the defendant tendered the above document at the time the deposition was taken, counsel for the defendant asked if there were

any objections, and counsel for the plaintiff replied: 'No.'" No objection was made at the time of the taking of the depositions to the introduction of the death certificate; it being expressly stated by the plaintiff's counsel that "there was none." At the trial, "the plaintiff's counsel called the court's attention to an examination of the laws of the State of Alabama, in the Alabama Code of 1940, published by authority, copy of which is kept in the Georgia State Library; and to Volume V, Title 22, Health Laws and Regulations, and the provisions thereof as to the State Board of Health, death certificates, and the duties of coroners; and tendering to the court a transcript of all of same for the court's use. It was not formally introduced in evidence." No objection was made at the time of the trial to the introduction of the Alabama death certificate, on the ground that the Alabama law, relating to such death certificate, was not proved.

The chapter of public health in the Code, § 88-1212, prescribes that "the Director of the Department of Public Health or ordinary or the county or city health officer shall, upon request, supply to any applicant, a certified copy of the record of any birth or death registered under the provisions of this law, and any such copy of the record of a birth or death, when properly certified by the Director of the Department of Public Health or ordinary or city or county health officer, as the case may be, shall be prima facie evidence in all courts and places of the facts therein stated, for which said applicant shall pay a fee of 50 cents. The United States Census Bureau may obtain, without expense to the State, transcripts or certified copies of births and deaths." Also, in this same Chapter (§ 88-1214), it is provided that: "The certificate of death shall contain the following items, and such other items as are deemed necessary for legal, social, and sanitary purposes subserved by registration records: . . . The medical certificate shall be made and signed by the physician, if there was any, last in attendance on the deceased, who shall specify the time in attendance, the time he last saw the deceased alive, and the hour of the day at which the death occurred. He shall further state the cause of the death . . . Causes of deaths which may be the result of either disease or violence shall be carefully defined; and if violence, the means of injury shall be stated, and whether (probably) accidential, suicidal, or homicidal." "The public laws of the United States,

and of the several States thereof, as published by authority, shall be judicially recognized without proof." *Seaboard Air-Line Ry. v. Phillips,* 117 *Ga.* 98 (43 S. E. 494). If the court had examined the laws of Alabama, "as published by authority," which were produced to him, he would have found that they were the same, in effect, as the laws of Georgia. *Wells* v. *Gress,* 118 *Ga.* 566, 568 (45 S. E. 418).

The *lex loci* governs as to all substantive matters, and the *lex fori* as to all matters affecting the remedy or procedure. Rules of evidence, the methods of shifting the burden of proof, and the presumptions arising from a given statement of facts, are matters affecting the remedy or procedure. *Southern Ry. Co.* v. *Robertson,* 7 *Ga. App.* 154 (2) (66 S. E. 535). The general rule is that courts do not take judicial cognizance of the law of a sister State, but by a statute of this State (Code, § 38-112), if the laws of a sister State are produced to the court, "as published by authority," the statute of the sister State may be judicially recognized without proof. *Seaboard Air-Line Ry.* v. *Phillips,* supra; *Missouri State Life Ins. Co.* v. *Lovelace,* 1 *Ga. App.* 446, 458 (58 S. E. 93); *Savannah, Florida & Western Ry. Co.* v. *Evans,* 121 *Ga.* 391, 395 (49 S. E. 308). It has been said in *Seaboard Air-Line Ry.* v. *Phillips,* supra, that "a volume of State laws, purporting on the title page to have been printed by order of the Governor, sufficiently shows publication by authority." Thus in the instant case, when the certificate of death was tendered in evidence and no objection was made that the Alabama law, relating to such a certificate was not proved (the only objection made being that it was hearsay), the plaintiff waived any objection, if he had any, that the Alabama law was not pleaded or proved, and if the death certificate was properly introduced under either the law of Alabama or that of Georgia, it was prima facie evidence and not hearsay. The evidence admitted over the objection urged in special ground 2 that it was hearsay does not show cause for a reversal.

█ The plaintiff, who was the beneficiary under the insurance policy, filed with the insurance company a written proof of death and attached thereto and made a part thereof the written affidavit of Dr. Bonney, the only physician who attended and treated the insured for the wounds that caused his death. The plaintiff in her proof of death expressly agreed therein that "the written state-

ments and affidavits of all the physicians who attended or treated the insured, and all other papers called for by the instructions hereon, shall constitute and are hereby made a part of these proofs of death." In this affidavit it is stated that the doctor, in answer to the question, "Was death due to accident, suicide, or homicide?" answered, "suicide," just as he had formerly stated in a death certificate signed by him. We think the plaintiff, by having made the affidavit a part of her written "proof of death," made this statement in the affidavit admissible in evidence against her. *Fair* v. *Metropolitan Ins. Co.*, 5 *Ga. App.* 708 (3) (63 S. E. 812).

Judgment affirmed. *Broyles, C. J., and Gardner, J., concur.*